## Norris et al. v. Hill.

Where N. and M. owned a water power with a grist mill and saw mill, as tenants in common, and they divided a part' of the property so held in common between them, one taking the grist mill and the other the saw mill, and executed releases to each other, the releases must be taken and construed *together as* one instrument, and with reference to all the surrounding circumstances to which they obviously and directly point ; and by such circumstances, not only the parties, but all persons claiming title under them, are bound.

It is a general rule of law and equity, that where a purchaser cannot make out a title but by a deed which leads him to another fact, he shall be presumed to have knowledge of that fact.

A grant of land bounded by a stream, carries with it the bed of the stream to the centre, unless a contrary intention clearly appears from the conveyance itself.

The provision of R. S. p. 509, conferring jurisdiction, in cases of nuisance, on equity courts, was not intended to extend or enlarge their jurisdiction.

Where complainants owned the water power on the east side of a river, and one half of the water power on the opposite or west side—the defendant owning the other half, and defendant had occasionally used more than his share of the water on the west side of the river, but no suit had been brought against him for doing so, and complainants had no machinery on that side of the river to be propelled by water, an injunction will not be granted restraining defendant in the use of the water.

Where complainants, who were the owners of three-fourths of a water power, were compelled to purchase a piece of land to secure to the proprietors of the power the right to flow it, a court of equity will not decree contribution by the owner of the other fourth of the water power.

APPEAL from the Court of Chancery. Norris and Follett, the complainants, and the defendant Hill, were the owners of separate mill property on the Huron river, at Ypsilanti; their mills being on opposite sides of the river, and supplied with water by a dam extending across the river from one bank to the other. Complainants were the owners of the water power on the east side of the river, where their mills were, and claimed to be the owners of one half of the water power on the opposite or west side of the river, where Hill had his mills, and they filed their bill in the court below against Hill and others, to restrain defendants from using more than their proportion of the water, and to

have the rights of the respective parties to the use of the water determined: also to compel Hill to pay a just proportion of certain purchase money that had been paid by complainants for lands flowed by the dam, in order to secure the right of flowing them. The court below having made a decree in favor of complainants, Hill appealed. The facts are fully stated in the opinion of the court.

*Backus & Lane,* for appellees.

*Buckbee & Emmons,* for Hill, the appellant.

*By the court,* GREEN, J. The defendant seeks to reverse the decree made by the chancellor upon two grounds: 1st, That if the complainants have shown any wrong on the part of the defendant, they have an adequate remedy at law, and he therefore claims the same benefit as if he had demurred to the bill for that cause: and 2d, That the defendant has done no act which is in violation of the complainants' rights, even if such rights exist to the extent claimed by the bill.

In order to arrive at a satisfactory solution of the questions involved, it will be necessary, in the first place, to inquire what are the rights of the respective parties in reference to the subject in controversy. For this purpose, it will not be necessary to go back beyond the 1st of April, 1831, at which time, as the pleadings and proofs show, Norris and McIntyre were the owners, as tenants in common, of about three acres of land in Ypsilanti, on the west side of the Huron river, and extending along the river above and below the mill dam, one end of which was attached to the west bank of the river, with a *saw mill and grist mill,* and other buildings thereon. The deeds from Hardy and wife to Norris, and from Reading and wife to McIntyre, under which they held, b oth described the premises as being bounded on one side by the river, and there can be no doubt that they owned the land to the thread or centre of the stream, according to the general rule of law, that persons who own lands on the different sides of a private stream, hold to the middle of the stream, unless the language of the grants under which they hold clearly shows the intent of the parties to fix the boundaries at the edge of the stream. People *v.* Canal Appraisers, 13 Wendell 355; Lunt *v.* Holland, 14 Mass. 149; Arthur *v.* Case, 1 Paige 447.

At the same time, Norris owned the land to which the dam was at-

tached, on the east side of the river, upon which he has since erected hydraulic works, whereby he and those claiming under him were and are entitled to one half of the usufruct of the water secured by the erection of the dam, as *an incident* to the ownership of the land on that side of the stream. 1 Paige 447. This separate ownership of Norris constituted a separate and distinct interest, as much so as if it had been owned by any other individual; and in considering this case, therefore, for the purpose of ascertaining the true rights and interests of the parties involved in the controversy, regard must be constantly had to this state of things.

From the period before mentioned until the 29th of September, 1832, Norris and McIntyre continued to be the owners of the mill property on the west side of the stream as tenants in common, and as such they were entitled to the use of one half the water raised by the dam, for the purposes of their mills. On the last mentioned day, each of them, by deed of that date, released and quit claimed to the other a portion of the common property; and the main difficulty in settling the rights of the parties will be overcome, if we shall be able to arrive at a satisfactory construction of those deeds.

The description in the deed from Norris and wife to McIntyre is in the following words:

" The equal undivided half of, in and to all and singular that certain tract or parcel of land situated in Ypsilanti aforesaid, on which is erected a saw mill, and more particularly described as follows: Beginning at the north east corner of the Godfrey tract so called, running thence down the Huron river to within thirty eight feet of the west end of the mill dam attached to the flume of said saw mill, thence west two rods, thence south three rods, thence east to the Huron river, thence down the river Huron to the south east corner of said saw mill, thence a westerly course to a stake and stones placed as a corner on the west line of said mill lot, thence north thirteen degrees and forty five minutes west four chains and five links to a corner on the north line of the God-frey tract so called, thence easterly on said line to the place of beginning; and also a free discharge of water from the said saw mill, or such other buildings as the said Timothy McIntyre shall erect, through and under the grist mill owned by the said Mark Norris, and without any obstruction on the part of the said Mark Norris,"

The deed from McIntyre and wife to Norris contains the following description, to wit:

"The equal undivided half of, in and to all and singular that certain tract or parcel of land situate in Ypsilanti aforesaid, on which is erected a grist mill and a building formerly used as a pail factory, and more particularly described as follows, viz: Beginning a short distance below the said pail factory, at the river Huron, north eighty degrees east of a crotched red oak stump standing on the top of the bank, running from thence to said crotched stump, thence south eighty degrees west two chains and twenty two links to a stake and stones placed for a corner, thence north thirteen degrees and forty minutes west two chains and twenty five links to a stake and stones, thence on an easterly course to the south east corner of a saw mill there standing, immediately above said grist mill, thence south to the place of beginning, it being the south part of the mill property heretofore owned by said McIntyre and Norris, and purchased by them of Asa H. Reading and David Hardy."

By these deeds, a division of so much of the common property was effected as is covered by them; and they must be taken and construed together as one instrument, in the light of all the surrounding circumstances to which they *obviously* and *directly* point; for by such circumstances, not only the parties to the deeds, but all persons claiming under them are bound, it being a general rule of law and of equity, that "when a purchaser cannot make out a title but by a deed which leads him to another fact, he shall be presumed to have knowledge of that fact." 1 Story's Eq. Jur. sec. 400; 3 Mason 531; 2 Ch. Cases 246; Ambler's Rep. 311; 2 Fonb. Eq. b. 3, ch. 3, sec. 1, note b.

It appears, then, that at the date of these deeds, there was upon the part conveyed to Norris a *grist mill*, and on the part conveyed to Mc Intyre a saw mill; and by reference to the deeds under which Norris and McIntyre held the premises, it appears that such mills were on the premises at the time of their respective purchases from Reading and Hardy; and that by such purchases they became the owners of the land to the thread of the stream, and as such were entitled to one half of the usufruct of the waters of the Huron river. The partition deeds also show that there was a dam connected with the west bank of the river, upon the common property; one half of which, or that portion of it which extended from the thread of the river to the west bank, and

a small piece of land extending two rods beyond the west end of the dam, were omitted in the partition, and continued to be holden in common by the parties.

It is conceded, as a legal consequence resulting from this state of facts, that Norris and those claiming under him were and are entitled to an equal share of the water right on the west side of the river, with McIntyre and those claiming under him. By reference to the description of the eastern boundary in the partition deeds, as located by the actual survey which was exhibited in the proofs, it clearly appears that neither party could draw water from the dam, to be used on his separate lands, without using some portion of the common property for that purpose.

The description in the deed from McIntyre to Norris, as " being the south part of the *mill property* heretofore owned by said McIntyre and Norris, and purchased by them of Asa H. Reading and David Hardy," and as being that part " on which is erected a *grist mill*," and the description in the deed from Norris to McIntyre, as being that part " on which is erected a *saw mill*," lead us directly to the fact that these premises were devoted to milling purposes, and that in order to make them available for such uses, the water must be drawn from the dam by means of a race or flume, with the necessary bulk-head, gates, &c.

By the term " *grist mill*," in the deed from McIntyre to Norris, must have been intended a mill with all the necessary incidents connected with it, to make it available as such, as contradistinguished from a mere building; for this term is immediately followed by the woads, " and a *building formerly used as a pail factory.*"

Being led to these facts and circumstances by the deeds themselves, under which the parties to this suit claim title, we are put upon the inquiry, what was the mode of using the water from the dam for the purposes of the mills by the respective parties at the date of the deeds? And upon this point we find the proof sufficiently clear and satisfactory. The water was conveyed from the dam to the respective mills, by means of a flume, divided at the head-gates by a partition, one branch of which extended to the saw mill, and the other to the grist mill; and the flume, or that portion of it which was used in connection with the grist mill, was situated on the easterly side of that which communicated with the saw mill, and beyond the margin, or over the bed of the river.

Norris *et al. v.* Hill.

From these premises the first, and perhaps the most important, question arises, as to the extent of the several grants from McIntyre to Norris, and from Norris to McIntyre: in other words, whether, by virtue of such grants, they respectively became entitled to the land to the thread or middle of the stream, or whether they were limited by the margin of the river.

The defendant insists, and his counsel have argued with much earnestness and great ingenuity, that these grants carry the parties to the middle of the stream, with the exception of the strip three rods in width at the west end of the dam, and including the land on which the dam stands; and that, inasmuch as no easement is reserved by or granted to Norris, to enable him to carry the water from the dam across the lands granted to McIntyre, the right which he is conceded to have to the usufruct of one-half the water on the west side of the river, as incident to his common ownership of the land on which the dam stands, is, and must remain, wholly unavailable to him. If this be the true construction of the partition deeds, the defendant, Hill, holding the title which McIntyre had, is made perfectly secure, for all beneficial purposes, in the entire use of one-half the water of the river. In support of this construction, reference is made to the grant by Norris to McIntyre of the right to a free discharge of water from the saw mill, or such other buildings as McIntyre should erect, through and under the grist mill owned by Norris.

The well established doctrine was laid down in the case of The People *v.* The Canal Appraisers, before referred to, as to the right of riparian proprietors; and unless a contrary intent of the parties clearly appears from the deeds under which they hold, such proprietors hold to the thread of the stream. That intent must be gathered from the entire instrument, which is to be construed in reference to the subject of the grant, and the surrounding facts and circumstances to which it leads.

Several of those facts and circumstances have been referred to, and so much of the language of the deeds as is material for that purpose has been noticed. It is evident, then, that the parties did not undertake by their deeds of partition to divide the whole property owned by them as tenants in common. The dam, and the land on which it stands, and a piece of land extending two rods beyond the end of the dam, were still

retained as common property, and the right to an equal use of the wa-
ter, as incident to such common ownership, still remained as before; and
the land covered by the water raised by the ·dam, must of necessity
subserve the same common purpose, so long as the dam should be kept
up, that it had done before.   There is nothing in the deeds that implies
any intent by either party to abandon the use of the water for the pur-
poses of the mills then in operation; but on the contrary, every thing
in the language of the deeds implies that both parties contemplated the
continued use of it for such mills, or others which they might after-
wards erect.

By limiting the parties to the boundaries fixed by their grants re-
spectively, their legal and equitable rights to the usufruct of the water
are protected.   By extending those boundaries to the middle of the
stream, the just rights of one party are practically taken away and con-
ferred upon the other.

In view of all these considerations, there can hardly be any doubt as to
the proper construction of the deeds, nor but that the parties must
clearly have intended to limit themselves by the bounds they prescribed.
This construction renders the grant by Norris to McIntyre of a right to
a free discharge of water through and under his grist mill, entirely con-
sistent with the claim of the complainants to an easement for the pur-
pose of a flume over the bed of the stream; for neither of them reserved
or conveyed, by any express language in the deeds, any easement in or
over the common property; and if one of them might use it, the other
had the same right.

The defendant, George Hill, holding the title which McIntyre had,
has the same rights which McIntyre possessed, and no greater, unless in-
tervening circumstances have occurred to extend them.   But it is con-
tended that when he purchased of Ballard, the old flume which had
been used by Norris to supply his mill had been removed, and the use
of the mill abandoned by Norris, and that he purchased in good faith,
without knowledge of Norris' right, if any he had, to keep up a flume
where the old one had stood. It appears from the pleading and proofs, that
Norris continued to use the old flume to supply his mill from the time
of the division in 1832, until after Ballard had erected his new mill in
the fall of 1839, when Ballard cut away a portion of it, and appropria-
ted the remaining portion for supplying his own mill.   The defendant,

Hill, admits in his answer upon information, the cutting away of the old flume by Ballard in the month of October, 1839, and charges that Norris prosecuted an action at law against Ballard for damages, which was settled, &c.; that he is informed that Norris claimed to have some right, either by custom or otherwise, of the precise character of which he is unadvised, to draw water from the dam through the east part of said flume. Ballard, also, in his direct testimony says, that at the time he contracted with Hill to sell the flouring mill and saw mill property, he told Hill that there was a difficulty with Norris about the flume; that he had cut it away, and Norris had sued him for doing so, and that Norris claimed a right to use water on that side of the stream. Here is strong evidence of actual notice to Hill of the existence of the old flume, and the use of it by Norris for supplying his grist mill at the time of the purchase from Ballard. But whether this be conclusive or not, Hill had knowledge, from the recorded deeds, of the right of Norris to use the water, and this was sufficient to put him upon inquiry as to the manner in which he had a right to convey it from the dam to his mill.

Having arrived at the foregoing conclusions as to the rights of the respective parties, holding the titles of Norris and McIntyre respectively, the next question is, whether the complainants have shown such a case as entitles them to the relief asked by the bill. One of the grounds upon which relief is prayed, is, that for the last two or three years the defendant has frequently, especially in times of low water, drawn upon the west side more than half the water of the river. If the charge in that behalf contained in the bill were *prima facie* sufficient, the testimony shows, at most, but an occasional or casual infringement of the complainants' rights, and is altogether too loose and unsatisfactory to justify this court in acting upon it, especially as it does not show any intention on the part of Hill, or those acting under him, to continue such infringement.

Another ground upon which relief is prayed is, that Hill, in violation of the rights of the complainants, has, ever since he became the owner of the mill erected by Ballard, kept up and maintained a flume from the dam to his mill, on and over the same land which was covered by the old flume connected with Norris' grist mill, to the exclusion of the complainants, and that he has used, and continues to use,

more than one quarter of the water of the river. Admitting these charges to be true, and they seem to be established by the pleadings and proofs, it does not follow that the extraordinary powers of this court can be exerted to enjoin the defendant. " In regard to private nuisances, the interference of courts of equity, by way of injunction, is undoubtedly founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing multiplicity of suits." See 2. Story's Eq. Jur. sec. 925 ; Fonb. Eq. by Jeremy, 49, 50, in notes.

The provision of the R. S., p. 505, conferring jurisdiction, in cases of nuisances, upon the chancery courts, was referred to in the argument; but that provision was not intended to enlarge or extend the jurisdiction of those courts. Upon which of the grounds above mentioned the interference of a court of chancery can be invoked in this case, it is not easy to perceive. Hill has been in the possession and use of his mill, using the land and the water in question for several years, and no suit at law or other litigation between these parties ever appears to have been instituted or had, nor is it at all apparent, or perhaps probable, that any litigation will be unavoidable to enable the complainants to secure and maintain their rights. Upon the ground of restraining irreparable mischief this case equally fails. The complainants do not appear to have made any actual attempt to use their water right on the west side of the river since Hill purchased his mill, nor to have provided any means of doing so. On the contrary, it appears that soon after Ballard cut away the flume in the fall of 1839, the valuable portions of the machinery were removed from the old mill, and the use of it as such was abandoned, since which time neither of the complainants has had any machinery on that side of the river, to be propelled by water. Until they have some use for the water power pertaining to that side of the stream, they cannot be injured by the use of it by Hill.

But it is insisted, on the part of the complainants, that the court of chancery has power to ascertain and determine, by decree, the rights of the respective parties to the use of the water, and to secure those rights by causing the water to be measured and guaged, so that each may draw his just share, and no more. This case, as made out by the proofs, does not seem to come within the principle of any of the cases

cited in support of the jurisdiction. In the case of Belknap *v.* Trimble, 3 Paige, 577, the court held, that where different mill owners have a common right to an artificial use of water for their respective mills, the court of chancery has jurisdiction so to regulate the common use of the water, as to preserve the rights of each. In that case the complainants were the owners of mills, exercising their right, as far as the acts of the defendant did not prevent them, and the acts complained of were destructive of the complainants' business, and the court might properly interfere upon the ground of preventing immediate and irreparable mischief. No such ground is shown in this case, and it will be early enough to invoke the preventive power of a court of chancery, when the exigency happens which calls for its exercise.

There is another branch of this case, entirely distinct and separate from that which has been considered, and no way connected with it, except that it relates to the creation or sustaining of the water power. The complainants allege that they are the owners of two several parcels of land above the dam, partly flowed by the water raised by said dam, which Norris was compelled to purchase, in order to secure to the proprietors of the water power the right of flowing the same; and they pray that the defendants, or one or more of them, may be decreed to pay to complainants one-fourth of the sum paid by Norris for said lands, with interest, or to pay a yearly compensation in damages for the flowing of the same. No case has been cited where such a power has been exercised by a court of equity under circumstances like these. The case of Rogers *v.* McKenzie, 4 Vesey 752, was between the joint and separate estates of bankrupts, who were jointly and severally bound for a debt to the crown. That of Wright *v.* Hunter, 5 Vesey 792, and that of Sells *v.* Hubbell, 2 John. Ch. R. 394, were cases of contribution between the estates of copartners. If the court has power to decree payment by Hill of one-fourth of the purchase money, or the payment of damages resulting from the flowing, it would follow that the court could and ought to inquire into the relative amounts paid by any of the parties, or those under whom they claim, for all the lands flowed by the water raised by the dam; or the damage which each of them sustains by reason of the flowing of his land, so that each party might be placed upon an equality with the other in that respect. This is not asked by the bill.

A court of equity will not take jurisdiction of a matter which does not come within the principles of any adjudged case, nor any of the established principles upon which equity jurisdiction is based: and this seems to be a matter of that character. Certainly the principle of contribution has never been extended so far.

Norris, in order to entitle himself to any just right to complain, should at least have consulted his co-tenant, and given him an opportunity to take part in the negotiations for the purchase if he thought proper to do so. Suppose an action on the case had been brought by the owners of these parcels of land, against all the proprietors of the dam, and judgment recovered, and the whole collected out of Norris. Such judgment being for a tort, Norris could not have compelled a contribution, either in a court of law or of equity. Ellis *v.* Ellis, 2 Johns. Ch. R. 131.

From the view taken of the true construction of the partition deeds between Norris and McIntyre, and the rights of the parties holding their respective titles, it becomes unnecessary to decide several of the questions made on the argument, and which are not now noticed, although every question raised has been fully examined; but it may be hoped that the full exposition of the rights of the parties which has been attempted so far as became necessary in the decision of this case, will guide them in making such a just and amicable arrangement for the future protection and exercise of those rights, that no occasion may hereafter arise for an appeal to the remedial powers of a court of chancery.

The decree of the court of chancery in this case must be reversed, with costs.

*Decree reversed.*