HEERINGA v PETROELJE

Docket No. 274852. Submitted June 10, 2008, at Lansing. Decided July 1, 2008, at 9:05 a.m. Leave to appeal sought.

Jodi P. Heeringa, trustee of the Jodi P. Heeringa Trust, dated May 7, 1985, brought an action in the Ottawa Circuit Court against Glenn E. and Marilyn C. Petroelje, trustees of the Marilyn C. Petroelje living trust, dated November 2, 1999, seeking an order requiring the defendants to remove an extension of the defendants' dock that they had placed pursuant to a permit issued by the Department of Environmental Quality (DEQ) in Pine Creek Bay, a part of Lake Macatawa. The parties own adjacent riparian lots on the shore of Pine Creek Bay. The DEQ had issued the permit, following a contested-case hearing involving the parties, after it determined that the dock extension would not interfere with the plaintiff's riparian rights. The court, Edward R. Post, J., following a bench trial dominated by the testimony of the parties' respective surveyors, held that the boundary line between the parties' riparian bottomlands lies where the plaintiff's surveyor contended, necessitating the removal of the dock extension. The court also held that the defendants had acquired title to the land underlying their original dock and its adjacent structures by adverse possession. The defendants appealed, and the plaintiff cross-appealed.

The Court of Appeals *held*:

1. The trial court erred in failing to give the DEQ determination its proper preclusive effect. The DEQ's determination was legally correct.

2. The DEQ properly stated that it did not have the authority to determine any sort of property lines, and the DEQ did not determine any property lines. However, the DEQ did determine which of the parties' respective riparian surveys best depicted the correct thread line (the middle or center) in the bay. That factual determination constitutes an adjudication of a critical fact that has a preclusive effect on the trial court.

3. The defendants' surveyor employed the correct method. This method uses the General Land Office survey as the underlying basis for determining the thread, but other evidence may be considered to ultimately determine the shoreline.

4. The trial court erred in holding that the plaintiff's surveyor's riparian property lines were correct.

Reversed and remanded.

WATER AND WATERCOURSES — BOUNDARIES — RIPARIAN BOUNDARY LINES.

The general method for determining riparian boundary lines involving irregularly shaped bodies of water is to first draw a "thread" line through the geographic middle of the body of water, then determine whether the riparian landowners' surface property lines intersect with the water, and then draw lines from the thread at as close to right angles as possible as measured at the thread line to the landward terminus points; the thread line must be determined on the basis of the shape of the original shoreline; the United States government survey at the time the government parted with title to the property is used as the underlying basis for determining the shoreline, but other evidence may be used to determine the actual shape of the original shoreline; the general rule for drawing riparian boundaries from the thread requires right angles to be drawn therefrom, but the general rule should be flexed where necessary to equitably apportion useful riparian rights to riparian landowners.

*Varnum, Riddering, Schmidt & Howlett LLP* (by *Eric J. Guerin*) for the plaintiff.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Michael J. Hodge* and *Scott R. Eldridge*), for the defendants.

Before: DAVIS, P.J., and MURRAY and BECKERING, JJ.

DAVIS, P.J. The parties[1] are neighbors owning adjacent riparian lots on the shore of Pine Creek Bay, which is part of Lake Macatawa. The dispute in this case concerns defendants' extension of their dock. The original dock extended perpendicularly from defendants' shoreline, and the extension deflects slightly away from plaintiff's property, but because of the irregular shape

---

[1] For ease of reference, we will sometimes refer to plaintiff as "the Heeringas" and defendants as "the Petroeljes" in this opinion.

of the bay and the concavity of the parties' shoreline area, plaintiff contends that the extension intrudes upon its riparian bottomlands. The trial court, after a two-day bench trial dominated by testimony from the parties' respective surveyors, held that the boundary line between the parties' riparian bottomlands lies where plaintiff's surveyor contended it lay, necessitating removal of the dock extension, but that defendants had acquired title to the land underlying their original dock and its adjacent structures by adverse possession. Both parties appeal, and we reverse and remand.

The important background facts are undisputed. The Petroeljes own a large parcel of property, but it tapers to only 20 feet of shoreline. The Heeringas own another parcel of property immediately to the south with 200 feet of shoreline. Both parties have docks that extend perpendicularly from their shorelines—the Petroeljes' dock from the middle of theirs, the Heeringas' dock from slightly to the north of the middle. The Petroeljes had been putting seasonal docks into the bay since before the Heeringas purchased their property in 1981, and had installed a 62-foot permanent dock by at least 1985. The water level in Lake Macatawa has gone down over the years, rendering it difficult or impossible to dock boats at either party's dock.

In 2000, the Petroeljes sought a permit from the Department of Environmental Quality (the DEQ) to extend their dock. This ultimately resulted in both parties retaining surveyors to determine their riparian boundary lines, followed by a contested-case hearing before the DEQ. The DEQ emphasized that it lacked jurisdiction to legally determine property boundary lines, but it determined that the dock extension would not interfere with the Heeringas' riparian rights. The Petroeljes received their permit in July 2004, and had

completed the extension by the following November. The Heeringas commenced the instant action seeking to have the extension removed.[2] The Petroeljes moved for summary disposition, arguing that the DEQ's determination constituted collateral estoppel of the riparian-survey issue; the trial court disagreed, and most of the trial consisted of testimony by the surveyors.

The surveyors agreed on most issues, consistent with the caselaw we discuss later in this opinion. Briefly, the proper method for determining riparian boundary lines involving irregularly shaped bodies of water is: first, to draw a "thread" line through the geographic middle (as opposed to the deepest point) of the body of water; second, to determine where the riparian landowners' surface property lines[3] intersect with the water; and third, to draw lines from the thread at as close to right angles as possible *as measured at the thread line* to the "landward terminus points." The thread line must be determined on the basis of the shape of the "original" shoreline, referring to the date the United States government parted with title to the property.

The surveyors' major point of disagreement was that the Heeringas' surveyor contended that the thread line must be drawn strictly on the basis of the General Land Office (GLO) survey with no other considerations permitted, whereas the Petroeljes' surveyor contended that the GLO survey was the underlying basis for drawing the thread line, but that other evidence could be con-

---

[2] The Heeringas emphasized that, although they believed they could argue that the original dock itself was almost entirely on the Heeringas' bottomlands and that the Petroeljes might be precluded from any access to the water at all, the only relief the Heeringas wanted was removal of the dock extension.

[3] The location of the parties' shared surface boundary line, including where that boundary line intersects with the water of the lake, is not and was not at issue in this matter.

sidered to determine the actual shape of the original shoreline. The surveyors agreed that, whatever the basis for determining the original shoreline shape, how to draw the thread line entailed some subjectivity and "art." The surveyors agreed that the underlying goal was to "equitably apportion" riparian bottomlands according to relative shoreline lengths. The Heeringas' surveyor opined that the Petroeljes' surveyor violated the legal requirements for determining the thread line, whereas the Petroeljes' surveyor opined that the Heeringas' surveyor was improperly elevating methodology over the underlying purpose. The surveyors' thread lines were very similar, with the exception that the Petroeljes' surveyor's line "deflected," or changed direction, more than the Heeringas' surveyor's line. The trial court ultimately concluded that the Heeringas' surveyor had employed the more correct method.

"We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When deciding a motion under MCR 2.116(C)(7), alleging that the claim is barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Maiden, supra* at 119.

We conclude that the trial court erred in failing to give the DEQ determination its proper preclusive effect, and we further conclude that the DEQ's determination was legally correct in any event.

Preclusion doctrines, among them the doctrine of collateral estoppel, are intended to preclude parties who "have previously had a full and fair opportunity to adjudicate their claims" in either a court or an agency setting from attempting to have those matters adjudicated again. *Nummer v Dep't of Treasury*, 448 Mich 534, 541-542; 533 NW2d 250 (1995). The parties only seriously dispute whether the DEQ actually determined an essential fact. *Id.* at 542. The DEQ explained that it only had the jurisdiction to determine whether the dock would invade "riparian rights" as defined in MCL 324.30101,[4] "as opposed to drawing property lines per se." The DEQ did, however, state that the Heeringas' proposed riparian boundary lines would "make no sense and def[y] logic" and "may not even be physically possible" given the layout of the other docks throughout Pine Creek Bay and the "relative riparian interests in the sense of the physical configuration of the area . . . ." The DEQ further found that "the extension will not adversely affect the riparian uses of the [plaintiff]," noting also that plaintiff's interest was "immediately adjacent to the project," so the fact that plaintiff's interest was unaffected meant no other interests in the area were. It finally determined that "the sealed survey provided by [the Petroeljes] is sufficient to find the project is sited entirely on bottomland within [their] riparian interest" and "[b]ecause [the Heeringas'] proposal would adversely affect riparian rights, it cannot be permitted."

The DEQ did not actually adjudicate the location of the parties' common riparian boundary line, but it *did* make factual findings regarding the location of the

---

[4] The subsection has been redesignated—albeit with no substantive change—several times. Currently, "riparian rights" are defined in subsection 30101(*o*). The DEQ did not specify a subsection.

thread line on the basis of the relative propriety of the proposed surveys. Additionally, the DEQ found that defendants' dock would not interfere with plaintiff's "riparian rights," as defined in MCL 324.30101. However, the Legislature has not defined what those "riparian rights" actually are.

The earliest Michigan caselaw considered it well established that "as to the right of riparian proprietors; and unless a contrary intent of the parties clearly appears from the deeds under which they hold, such proprietors hold to the thread of the stream." *Norris v Hill*, 1 Mich 202, 207 (1849). The "thread," as was agreed to by both surveyors in the instant matter, referred to the middle or center of Pine Creek Bay. *Id.* at 203, 207. The area over which a riparian owner has these rights is determined by drawing a right angle to the central thread because

> [a]ny other rule would subject riparian owners to have their entire access to the stream and all their docking privileges cut off, whenever the local curve of the shore would be such that a line drawn at right angles with their neighbor's shore line would cross in front of them—a result which would be inevitable where the shore is not altogether straight and parallel with the middle of the stream, and which would also cause great confusion with every subdivision of ownership. [*Bay City Gas-Light Co v Industrial Works*, 28 Mich 182, 183 (1873).]

Although the body of water in *Norris* was a stream, the same rule applies to lakes. *Rice v Ruddiman*, 10 Mich 125, 139-143 (1862).

The *nature* of the riparian ownership from the shore to the thread is, at its simplest, an entitlement to "every beneficial use of the [underwater] property in question which can be exercised with a due regard to the common easement." *Lorman v Benson*, 8 Mich 18, 32

(1860). "Any erection which can lawfully be made in the water within those lines belongs to the riparian estate. And the complete control of the use of such land covered with water is in the riparian owner, except as it is limited and qualified by such rights as belong to the public at large to the navigation, and such other use, if any, as appertains to the public over the water." *Ryan v Brown*, 18 Mich 196, 207 (1869). "And this right to the covered lands in front has always been held to exclude any adjacent claimant from intercepting in any way the full extent indicated by the width at the shore, without reference to whether the tract approaches the shore at right angles or diagonally." *Clark v Campau*, 19 Mich 325, 328 (1869). Although "the private right must yield to the public right," otherwise that private right extends even to considering it a trespass for another party to construct something on that bottomland. *Ryan, supra* at 209. Therefore, a riparian landowner's riparian rights to water-covered bottomlands are, other than the public's right of reasonable access to the water itself, indistinguishable from ordinary fee ownership of dry land.

Nevertheless, the DEQ repeatedly emphasized that it did not determine any sort of property lines, and indeed it lacked the authority to do so. The DEQ did, however, determine which of the parties' respective riparian surveys best depicted the correct thread line in Pine Creek Bay. That factual determination—the DEQ's rejection of the Heeringas' survey—constitutes an adjudication of a critical fact that has a preclusive effect on the trial court. We further observe that the DEQ reached the correct result.

The Heeringas in their briefs in the trial court and on appeal rely on *Cutliff v Densmore*, 354 Mich 586; 93 NW2d 307 (1958), for the proposition that " '[t]he

proper shoreline used in fixing the boundaries of a riparian owner's subaqueos lands is determined by determining the shoreline at the time the United States government patented the lake and surrounding land to the State of Michigan.' " (Plaintiff's brief on appeal, p 19.) But no such—or even similar—language appears in that case, nor can we find it in any Michigan decision. Furthermore, *Cutliff* only dealt with *surface* property boundaries where riparian shorelines change through accretion. *Cutliff* relied on *Hilt v Weber*, 252 Mich 198; 233 NW 159 (1930). *Hilt* held that water boundaries are inherently dynamic, so meander lines are—both legally and factually—merely general approximations of the shoreline; it is the water itself that is the real boundary. *Id.* at 204-227; see also *Glass v Goeckel*, 473 Mich 667, 693 n 23; 703 NW2d 58 (2005). In *Pittsburgh & Lake Angeline Iron Co v Lake Superior Iron Co*, 118 Mich 109, 123; 76 NW 395 (1898), which was ultimately decided on the basis of a contract, it was explained that "[n]o fixed rule ever has been or ever can be laid down for the division of the territory covered by these inland lakes, with their irregular shores. Each case must depend upon its own peculiar circumstances and facts, and as reasonable a division arrived at as possible." The trial court's decision was largely premised on a rule used in establishing riparian boundaries that was allegedly stated in *Cutliff*; however, *Cutliff* did not state that rule.

Although the meander lines were presumed correct in the absence of evidence to the contrary, the actual location of the water itself is the true boundary, even in a GLO plat. *Poch v Urlaub*, 357 Mich 261, 277-281; 98 NW2d 509 (1959). As the Petroeljes' surveyor therefore correctly explained, the GLO survey was the "underlying basis" for determining the thread, but ultimately, the thread depended on the shoreline as determined by all available evidence, not on the GLO survey meander

lines alone. He also correctly explained that the "rule" was intended to accomplish equity, not to mandate the elevation of procedure over purpose. Indeed, the "object to be kept in view in cases of this kind is to secure to each proprietor access to navigable water, and an equal share of the dockage line at navigable water, in proportion to his share on the original shore line," and if that goal could not be accomplished by drawing right angles to the thread, some other method may be required. *Blodgett & Davis Lumber Co v Peters*, 87 Mich 498, 506; 49 NW 917 (1891).

In summary, no party has cited any case, nor can we find one, establishing a rule specifying how the thread must be established and what evidence—if any—may or must be resorted to in order to find it, other than the simple requirement that it must be the middle of the body of water based on the original shoreline. The general rule for drawing riparian boundaries from the thread requires right angles to be drawn therefrom, but the general rule should be flexed where necessary to accommodate the underlying purpose, which is to equitably apportion *useful* riparian rights to riparian landowners. The trial court erroneously decided this matter largely on the basis of a nonexistent rule of law. Application of the correct legal rules to the surveyors' testimony shows that the Petroeljes' surveyor employed the correct method, whereas the Heeringas' surveyor elevated a mechanistic application of a nonexistent rule over the underlying goals to be served.

The trial court erred in holding the Heeringas' surveyor's riparian property lines to be correct, because of the preclusive effect of the DEQ's determination, and the Petroeljes' surveyor used the more correct method in any event. We therefore need not address any of the other issues raised on appeal.

Reversed and remanded for any further proceedings that may be necessary. We do not retain jurisdiction.