*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RHONDA DAVIS,

Plaintiff-Appellee,

v

BEE PROPERTY MANAGEMENT,

Defendant-Appellant,

and

CAROLYN Y. WILLIAMS, HOWARD L. WILLIAMS, THE BANK OF NEW YORK TRUST COMPANY, NA, JP MORGAN CHASE, NA, and RESIDENTIAL FUNDING COMPANY, LLC, formerly known as RESIDENTIAL FUNDING CORPORATION,

Defendants.

UNPUBLISHED
January 25, 2024

No. 364221
Wayne Circuit Court
LC No. 20-013023-CH

Before: CAVANAGH, P.J., and RICK and PATEL, JJ.

PER CURIAM.

Defendant, Bee Property Management (Bee), appeals as of right an order quieting title in favor of plaintiff. We affirm.

## I. FACTUAL BACKGROUND

Plaintiff has resided at 17313 Ilene Street in Detroit, Michigan (the property), since 2009, first as a renter, and then as the property owner. The house was previously owned by plaintiff's uncle. After he passed away, the property was transferred from plaintiff's aunt to plaintiff via quitclaim deed in April 2013. Plaintiff later lost the property to tax foreclosure. On December 1, 2014, Bee purchased the home from the Wayne County Treasurer for $6,000. Bee is a business

-1-

that buys, sells, and rents real estate. It is solely owned by Michael Baumhaft. Baumhaft also owns Michigan Vanguard Properties (Vanguard).[1]

On November 26, 2014, plaintiff and Vanguard entered into an agreement titled "Option Agreement," which states, in pertinent part:

2. Term of Option. This Option agreement shall exist and be exercisable from the date on which the Parties complete execution of this agreement and the Agreement between them, throughout the term of the Agreement, including any extension term thereof, or the date of proper exercise, whichever is sooner, subject only to limitations on its exercise that are specified herein. As long as Buyer shall not have been at any time in material breach of the Agreement between the Parties, Buyer may exercise the option at any time during the effective term of this agreement by giving Owner written notice of their election to exercise it. Notwithstanding anything else herein to the contrary, Buyer must exercise the option, and close the sale thereunder, no later than sixty-six (66) months following execution of this Agreement.

* * *

4. Purchase price. If the option is exercised during the first sixty (66) months of the Agreement, the purchase price of the option property shall be $17,000.00. The price of this Option to Purchase is $550.00 per month for a period of sixty (66) months, payable at the date on which monthly installments are due under the Agreement. On the 66th payment Michigan Vanguard Properties will deed the property over to the Buyer for $1.00.

* * *

7. Taxes. All real estate taxes for all years billed before the closing date shall be fully paid by Buyer. Real estate taxes billed after the closing date shall also be paid by Buyer. If taxes are not paid on time by Buyer, Owner may pursue legal remedies or may cancel the contract.

* * *

10. Default. If Buyer defaults, Owner may pursue legal remedies or may cancel the contract and initiate eviction proceedings.

* * *

13. Exercise of option. Before expiration of the option, Buyer may exercise this option by giving Owner written notice, signed by Buyer and delivered personally or by certified mail. Notice shall be given at Owner's address set forth above or at

---

[1] Neither Baumhaft nor Vanguard are named as defendants in this case.

any subsequent address that Owner may provide to Buyer in writing. Upon exercising the option and closing the purchase, Buyer agrees to accept the property in "as is" condition.

Plaintiff did not have the opportunity to consult a lawyer about the terms of the agreement before signing, and was informed that if she did not agree to the terms of the option agreement, she would be forced to leave the property.

There is no dispute that plaintiff did not timely remit all of her monthly payments. Consequently, in March 2019, plaintiff received a letter from Bee, stating: "As of the date of this letter, the option agreement is in default . . . . Please accept this letter as formal notice that Bee Property Management, Inc. has elected to exercise its right to terminate the Option Agreement as a result of your default." However, plaintiff never received a notice of default, notice to quit, or complaint to recover possession from Vanguard, with whom she signed the original option agreement. Over the following nine months, Bee brought multiple district court proceedings against plaintiff for unpaid rent, none of which resulted in eviction.

The option period ended on or about May 26, 2020. Plaintiff continued to live in the home after the close of the option period. On September 11, 2020, plaintiff sent a letter to Bee, stating that she made $6,600 in monthly payments each year from 2015 through 2019, as well as $4,400 in monthly payments in 2020. Plaintiff also claimed that she paid $1,897.41 in property taxes in 2015, $1,721 in taxes per year from 2016 through 2019, and $860.05 in taxes in 2020. She went on to explain:

> To date I have paid, $37,400 in rent payments and $11,363.00 in property taxes. According to the original agreement the cost of the property [is] $17,000.00[.]
>
> I have exceeded the cost in the original agreement, and my expectations are to receive a Quit Claim Deed to the property as owner.

Believing that she complied with the terms of the option agreement, plaintiff stopped making monthly payments. Bee refused to provide the deed.

Plaintiff subsequently filed suit against Bee and a number of other involved parties,[2] seeking to quiet title under MCL 600.2932. A bench trial was held. Plaintiff argued that Bee did not have authority to terminate the option agreement, because Vanguard, not Bee, was party to the agreement. Plaintiff also argued that according to the terms of the agreement, she was entitled to ownership of the property because she paid more than the required purchase price of the property through her monthly payments.

In response, Bee argued that plaintiff was mischaracterizing the agreement as an installment contract, rather than an option agreement. Bee explained that plaintiff could not quiet

---

[2] Although a number of other parties were named as a defendants, Bee is the sole party participating as a defendant on appeal.

-3-

title to the land because she never exercised the option to purchase it in accordance with the terms outlined in the agreement. Bee also argued that any ignorance of the agreement terms claimed by plaintiff did not absolve her of her obligations under the agreement. Bee contended that it had properly terminated the agreement for plaintiff's failure to make some monthly payments and pay the property taxes.

During trial, plaintiff and Baumhaft testified regarding the formation of the agreement, their understanding of its terms, and the monthly payment and tax payment history. Plaintiff explained how Vanguard came to own her home, as well as her understanding of the terms of the option agreement, as follows:

> *Q*. Can you tell the Court what happened?
>
> *A*. Well, I believe a woman—a lady knocked on my door and say I lost the property and she didn't explain to me. She just—her name was Karen. I remember her name now. Her name was Karen and she talked to me—wanted to talk to me about purchasing the house back but I didn't know what to do at the time.
>
> * * *
>
> *Q*. So, Karen comes to your home and says that they have your property, they own your home from a tax auction. What happens next?
>
> *A*. She gave me a building to meet, in Southfield. I think it was [Vanguard], and they offered to sell me the house back.
>
> * * *
>
> *Q*. How much did they offer to sell your home back for?
>
> *A*. Seventeen thousand.
>
> * * *
>
> *Q*. And what do you do next?
>
> *A*. I signed the agreement. That's what I—I went to—
>
> *Q*. And this agreement you're speaking about, is this—this Option Agreement?
>
> *A*. Yes.
>
> *Q*. So, what did you understand this agreement to mean?
>
> *A*. To me, explaining that they was gonna [sic] sell it back to me for $17,000.

*Q.* Did you understand what would happen if you didn't enter into this agreement?

*A.* I would be—yeah, I would have to move out.

*Q.* So, you felt like you had no choice?

*A.* I had no choice.

Plaintiff further explained why she paid more than double the stated purchase price of $17,000 by paying $550 per month for 66 months:

*Q.* I'm not the greatest that math but 550 for 66 months is about $36,300. If you thought you were buying your property back for $17,000, why did you agree to pay $36,300?

*A.* For the interest and the taxes on the house.

\* \* \*

*Q.* So, according to this [September 2020] letter [requesting a quitclaim deed] that you sent to Bee Property Management, you detailed all the option payments you made and all of the taxes you paid, correct?

*A.* Mm-hmm.

*Q.* And according to that, if you don't recall from personal knowledge, how much had you paid on the—for the property in option payments and in taxes?

*A.* Like 38,000.

*Q.* Okay.

*A.* Plus—the 38,000 with the house and I believe 14—13 or 14 through taxes.

\* \* \*

*Q.* " . . . shall not have been, at the time, in material breach of the agreement, between the parties, buyer may exercise the option, at any time, during the effective term of this agreement, by giving owner written notice of their election to exercise it."

Did you ever give written notice to Vanguard or Bee that you were exercising your option to purchase?

*A.* Yes, and I exercise—when I exercised this—this agreement, this is what I exercised. Yes. I didn't give—I did not give out no [sic] written notice. This is the only notice I signed. So—

*Q.* Okay.

*A.* —this is it.

*Q.* All right. So, you gave no—

*A.* I didn't go back and option to buy.

Q. All right.

*A.* No.

*Q.* So, while I'm sitting up here using this phrase, did you exercise your option, I can understand how—how maybe we're not speaking 100 percent the same language but I'll ask you just simply; did you give writ—

*A.* No.

*Q.* —written notice of anything to Bee better, after you left—left the office of the Michigan Vanguard Properties, where you signed this document?

*A.* No.

\* \* \*

*Q.* Did you ever pay—did you ever wire or send a check or drop off cash in a one[-]time payment of $17,000?

*A.* No.

Essentially, plaintiff's understanding was that in order to purchase the property, she could either pay Bee a lump sum of $17,000 during the option period, or she could pay $550 per month for 66 months, for a total of $36,300. She believed that since she had paid Bee well over $17,000, and indeed, well over $36,300, she was entitled to ownership of the property. She conceded that she did not give Bee separate notice of intent to exercise her option to purchase the property, but believed that she had adequately done so by signing the agreement. She believed she had adhered to the terms of the agreement in every other respect.

Baumhaft testified that his understanding of the option agreement was somewhat different:

*Q.* So, going back to—going off of what you were saying about the give and take of this, are you saying that if in 2016 the value—market value of that property went up to an estimate of a hundred thousand dollars, you couldn't go sell it for that price, right?

*A.* In 2016, if she was current with all her opt—under the agreement— under the Option Agreement, she could sell it for whatever she wants and all I'm getting is $17,000.

* * *

*Q.* But, in essence, she did pay more than the 17 though, right? Because of the monthly payments that were—as I—I'm just—it's just a basic question.

*A.* Yes, she paid—paid her keeping the Option Agreement alive—

*Q.* Okay.

*A.* —for all that time, paying 550 a month.

*Q.* Okay.

*A.* She did pay more but—

*Q.* Okay. She could've—could she have paid it off in advance of the 66 months?

*A.* Anytime—

*Q.* To up to six—

*A.* Up to 66 months.

*Q.* And whatever she had in the—in the bank at that time, would that have been credited toward her 17,000?

*A.* The option payment is not like an installment contract. None of those payments go toward the purchase of the $17,000.

*Q.* So, tell me how that works. Would she have had to pay an additional 17?

*A.* Yes. Because I'm looking at—it's because it—it's a give and take. I'm giving her the option to buy it at a fixed number that—and even at the time it was below market value.

* * *

*Q.* Okay. So—so–let me just make sure I understand this. Even though she was paying you $550 a month, she would've still had to pay out a lump sum of 17,000 at some period of time?

*A.* Correct.

*Q.* And if she paid it out earlier, she wouldn't have paid—

*A.* She wouldn't have to keep paying 550 a month.

Baumhaft's understanding of the agreement was that in order to obtain title to the property, plaintiff would have to pay a $17,000 lump sum. Under his interpretation of the agreement, even if plaintiff paid $550 per month for 66 months, she was only doing so to "keep[] the Option Agreement alive . . . ." Thus, the *only* way that plaintiff could purchase the property was via the $17,000 lump sum—rendering the $550 per month payments a sort of monthly rental fee, rather than installment payments that would go toward the purchase price.

At the close of the trial, the trial court ruled in favor of plaintiff, stating:

 . . . Now, as to the Option Agreement, the Option Agreement, under paragraph four, reads: "If the—if the option is exercised, during the first 66 months of the agreement, the purchase price of the option of the property shall be $17,000["] and Mr. Baumhaft has indicated if you had the property one month and you paid the $17,000 out, you would be good. And then, it goes on further to say that the price of this option to purchase is $550 per month, for a period of 66 months, payable at the date on which the monthly installments are due, under the agreement. On the, on the 66th payment, Michigan Vanguard Properties will deed the property over to the buyer for one dollar. So, I don't think this is ambiguous but what everybody else interprets it to be is something else. I see this as being twofold. As Mr. Baumhaft has indicated, if you pay it, during the 66 months, how ever many much [sic] you pay it off, then, you just have to pay the 17,000, and then that would be it. And then, in terms of the benefit there, Mr. Baumhaft, if someone went 66 months, then that's how you get to a total of $36,300. That's 550 times 66 months . . . . So, what I see is that this agreement is twofold. If you paid it off, during the 66 months, all you have to pay as an [sic] additional $17,000, if you had it but, on the 66th payment, if the 66 payments were made, then, all you have to do is pay the dollar. So, that's where we are.

However, the court noted that according to its calculations, plaintiff still owed some money toward the 66-month, $36,300 purchase price. The trial court explained:

[T]his is a court of equity and what we have here is we have a situation where Ms. Davis, even though she didn't fully comply, she did substantially comply, in that she paid, of the 36,300 that was due, she did pay 33,885 and I took the difference of that and that came out to be 2,415 . . . . [B]ased on the representations that Mr. Baumhaft gave me, from his ledger, she was $2,415 short on her agreement. I know this letter indicated that she had paid 37,400, but I don't have any proof that that's what she paid. . . . So, in this regard, if in fact, and this is the only—the only way that this it's doable, I'm putting this over and if Ms. Davis is able to pay . . . Mr. Baumhaft for the taxes that he paid on the property, which total $4,324.22 and the amount that is owed on the contract, $2,415, which totals $6,739, the Court will take this matter under advisement, . . . only for a period of 30 days.

On October 18, 2022, the trial court entered an interim written order requiring plaintiff to make a payment of $6,739.22 to Bee within 30 days. At the end of the 30 days, the trial court found plaintiff had paid the amount owed to Bee. It stated, in relevant part:

-8-

I stated last time that the plain—that the—that [plaintiff] had substantially complied with the terms of the agreement, within the time prescribed. The 66 months would have run through May, 2020 and I note that there was a letter that the plaintiff had sent, regarding her desire to exercise the same, and I don't know if that letter was dated. But the fact of the matter remains that there was substantial compliance.

The court thereafter entered an order quieting title and declaring plaintiff the owner of the property. This appeal followed.

## II. ANALYSIS

Plaintiff argues that the trial court's judgment quieting title in her favor was proper. We agree.

We review the trial court's findings of fact for clear error, and its conclusions of law de novo. *Heeringa v Petroelje*, 279 Mich App 444, 448; 760 NW2d 538 (2008). "Clear error exists only when the appellate court is left with the definite and firm conviction that a mistake has been made." *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 471; 719 NW2d 19 (2006) (quotation marks and citation omitted). "The trial court's findings are given great deference because it is in a better position to examine the facts." *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 251; 792 NW2d 781 (2010). Actions to quiet title are reviewed de novo by this Court. *Dobie v Morrison*, 227 Mich App 536, 538; 575 NW2d 817 (1998). Questions of law, including those regarding the proper interpretation of contracts, are also reviewed de novo. *Lueck v Lueck*, 328 Mich App 399, 404; 937 NW2d 729 (2019) (quotation marks and citations omitted).

The purpose of a quiet title action is to determine the right of title amongst parties who claim an interest in real property. *Beach v Twp of Lima*, 489 Mich 99, 102; 802 NW2d 1 (2011). The statute that governs actions to quiet title, MCL 600.2932, provides as follows:

(1) Any person, whether he is in possession of the land in question or not, who claims any right in, title to, equitable title to, interest in, or right to possession of land, may bring an action in the circuit courts against any other person who claims or might claim any interest inconsistent with the interest claimed by the plaintiff, whether the defendant is in possession of the land or not.

Plaintiff has the burden to prove "a prima facie case of title." *Beulah Hoagland Appleton Qualified Personal Residence Trust v Emmet County Rd Comm'n*, 236 Mich App 546, 550; 600 NW2d 698 (1999). To do so, plaintiff must present sufficient evidence demonstrating that she acquired and currently possesses a legal or equitable interest in the property. *Id*. If plaintiff can establish a prima facie case of title, "the defendant then has the burden of proving superior right or title in itself." *Fed Home Loan Mtg Corp v Werme*, 335 Mich App 461, 470; 966 NW2d 729 (2021).

To assess who holds superior title to the property at issue in this matter, the terms of the agreement must be examined. In general, an option to purchase is "an agreement by which the owner of the property agrees with another that he shall have a right to buy the property at a fixed price within a specified time." *In re Egbert R Smith Trust*, 480 Mich 19, 25; 745 NW2d 754 (2008) (quotation marks and citations omitted). This Court has stated that an option agreement is a

"contract for the privilege of purchase and not itself a contract of purchase." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 393; 761 NW2d 353 (2008) (quotation marks and citations omitted). Thus, an option agreement "does not create an interest in land until the conditions of the offer are met." *Id*. (citations omitted). Option agreements differ from installment contracts, where individual payments are made and accepted over a set period of time. See *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 532 n 5; 676 NW2d 616 (2004) (noting that *Black's Law Dictionary* defines "installment contract" as " '[a] contract requiring or authorizing the delivery of goods in separate lots, or payments in separate increments, to be separately accepted.' ").

The parties disagree over whether the contract at issue was an option agreement or an installment contract. However, regardless of how the agreement is categorized, the general rules applicable to the interpretation of contracts apply here. Generally, our primary goal in interpreting a contract "is to ascertain and effectuate the intent of the contracting parties. The law presumes that the contracting parties' intent is embodied in the actual words used in the contract itself." *City of Grosse Pointe Park v Mich Municipal Liability & Prop Pool*, 473 Mich 188, 218-219; 702 NW2d 106 (2005). Courts give contractual language its plain and ordinary meaning unless otherwise defined. *English v Blue Cross Blue Shield of Mich,* 263 Mich App 449, 471; 688 NW2d 523 (2004). "If the language of the contract is unambiguous, we construe and enforce the contract as written." *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003).

"If two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous." *Kendzierski v Macomb County*, 503 Mich 296, 311; 931 NW2d 604 (2019) (quotation marks and citation omitted). "[I]f provisions of a contract irreconcilably conflict or can be reasonably understood as meaning different things, the contract is ambiguous as a matter of law, and its proper meaning therefore becomes a question of fact" for the fact-finder to decide. *Andrusz v Andrusz*, 320 Mich App 445, 453; 904 NW2d 636 (2017). "Thus, the fact finder must interpret the contract's terms," considering the apparent purpose of the contract, the rules of contract construction, and extrinsic evidence of intent and meaning. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003) (quotation marks and citations omitted). Importantly, "courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity. Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable." *Id*. at 467.

The key paragraph of the agreement, entitled "Purchase price," states:

> If the option is exercised during the first sixty (66) months of the Agreement, the purchase price of the option property shall be $17,000.00. The price of this Option to Purchase is $550.00 per month for a period of sixty (66) months, payable at the date on which monthly installments are due under the Agreement. On the 66th payment Michigan Vanguard Properties will deed the property over to the Buyer for $1.00.

We conclude that the terms of the agreement are ambiguous. On one hand, the agreement states that plaintiff could exercise the option "during the first sixty (66) months" to purchase the property

for $17,000.[3]  The language indicating that "[t]he price of this Option to Purchase is $550.00 per month" would suggest that plaintiff was required to pay $550 every month simply to keep the option to pay the larger lump sum "alive," so to speak.  This is consistent with Baumhaft's testimony at trial indicating that the $550 monthly payments were only made as consideration for the option to purchase the property for $17,000.  However, the "option price" language conflicts with the last sentence of the provision, indicating that Vanguard would deed the property to plaintiff for $1 after she paid her 66 monthly payments.  Based on that language, it would appear that plaintiff's understanding of the agreement is correct, and that the $550 monthly payments were in fact "installments" made to pay down the principal balance on the property.  "[A]mbiguities are to be construed against the drafter of the contract."  *Klapp*, 468 Mich at 470.  The trial court did so here, ultimately finding that plaintiff would be entitled to the deed to the property after paying $550 per month for 66 months.  We agree with the trial court that on this record, plaintiff was entitled to quiet title to the property after paying her 66 monthly payments of $550 per month, plus an additional $1 for the deed to said property.[4]

While we agree with the court's overall decision to rule in favor of plaintiff here, we do note some issues with the trial court's analysis.  First, the trial court found that the contract was unambiguous, with which we plainly disagree, for the aforementioned reasons.  Second, we note that the court's conclusion that plaintiff substantially complied with the terms of the agreement

---

[3] Plaintiff notes on appeal that there is a discrepancy between the written term of "sixty" months and the numerical term of "66" months; however, the parties do not actually dispute that the terms of the agreement required plaintiff to pay $550 per month for 66 months.

[4] Were we to agree with Bee's understanding of the agreement's terms, Bee would walk away $36,300 enriched, and plaintiff would walk away with nothing at all, having lost her home in the process.  At best, such a contract could be seen as generating a windfall for Bee.  At worst, it could be considered predatory.  Similar contracts for "deeds of sale" are widely used to lure potential homeowners with low income or poor credit into contracts that blatantly favor the seller over the buyer:

> The contract for deed of sale "is a contract for the purchase and sale of real estate under which the purchaser acquires the immediate right to possession  . . . and the vendor defers delivery of a deed until a later time to secure all or part of the purchase price."  The vendee makes monthly payments to the vendor, and the vendor retains title until the vendee has paid the purchase price in its entirety, with interest.  Once the purchase price is paid in full, the vendor transfers the deed.  The opportunity for predation stems from the fact that these are contractual agreements that do not involve the extension of credit.  Therefore, absent legislative or judicial intervention, a contract for deed of sale does not extend to the vendee any of the legal protections of an equitable mortgage.  [Comment, *Predation, Exploitation, and History Repeating: Reforming the Modern Contract for Deed of Sale*, 93 Temp L Rev 211, 212 (2020) (footnotes omitted).]

We will not conclude that Bee intended such negative consequences for plaintiff when it set out to offer her this option agreement.  If we ruled in favor of Bee, however, we would be implying just that.  Worse, we would be rubber-stamping it.

was inadequately supported by an explanation of the applicable law. On this point, the trial court noted that "this is a court of equity and what we have here is . . . a situation where [plaintiff], even though she didn't fully comply, she did substantially comply" with the terms of the option agreement, and left it at that. The court's reference to "substantial compliance" suggests that it simply believed plaintiff had done enough—and, indeed, paid enough—to demonstrate compliance with the substantive terms of the agreement. In doing so, it treated the agreement as an installment contract, rather than an option agreement, and found that plaintiff had substantially held up her end of the agreement. See *Gibson v Group Ins Co of Mich*, 142 Mich App 271, 275; 369 NW2d 484 (1985) ("A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract." (citation omitted)). It thereafter sought something akin to specific performance by ordering plaintiff to completely pay off the property and then obligating Bee to hold up its end of the agreement.

Although we were able to infer the court's meaning for ourselves, we would nevertheless caution the court to more thoroughly explain these concepts in the future, so as to avoid confusion or unnecessary remands following appeal. However, regardless of any perceived deficiencies in the court's analysis, we will nevertheless affirm, as we have concluded that the court reached the correct overall result. See *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003) (stating that "[a] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.").

Bee finally argues that the agreement was terminated before the term expired, and before it received all 66 payments due. The agreement states that "[i]f [plaintiff] defaults, Owner may pursue legal remedies or may cancel the contract and initiate eviction proceedings." However, under the terms of agreement, *Vanguard*, and not Bee, was the owner of the property. There is no dispute that plaintiff never received a notice of default, notice to quit, or complaint to recover possession from Vanguard. Additionally, Bee continued to accept additional payments from plaintiff after it, and Bee, not Vanguard, attempted to notify plaintiff the agreement was terminated. Our Supreme Court has stated that, in response to a breach of contract,

> [a]ny act indicating an intent to continue will operate as a conclusive election, not indeed of depriving [the injured party] of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his part. Anything which draws on the other party to execute the agreement after the default . . . or which shows that it is deemed a subsisting agreement after such default will amount to a waiver. [*Schnepf v Thomas L McNamara Inc*, 354 Mich 393, 397; 93 NW2d 230 (1958) (citations omitted).]

Thus, any attempt by Bee or Vanguard to terminate the agreement was ineffective because of Bee's continued acceptance of payments from plaintiff in the months after the termination notice it gave plaintiff in March 2019. Accordingly, Bee's argument on this issue lacks merit.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Michelle M. Rick
/s/ Sima G. Patel