*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MILENIUM, INC.,

        Plaintiff/Counterdefendant-Appellant,

v

KML COMMUNICATIONS, INC.,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
September 14, 2023

No. 361876
Oakland Circuit Court
LC No. 2020-184052-CB

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Plaintiff/Counterdefendant appeals as of right the judgment issued after a bench trial, dismissing its claims against defendant/counterplaintiff in this breach of contract action regarding construction work. On appeal, plaintiff argues the trial court erred in: (1) finding defendant's operations manager and former project manager were credible witnesses; (2) misunderstanding the timing of the evidence, and misapplying the law, in finding plaintiff committed the first material breach; (3) failing to find defendant committed the first material breach when it did not pay plaintiff's invoice within seven days of submittal; and (4) failing to find plaintiff established a valid claim for an account stated. We affirm.

## I. BACKGROUND FACTS

Plaintiff is a business that performs subcontractor underground boring work to install utilities. Plaintiff entered into a subcontract (the "Agreement") with defendant, a general contractor, to install conduit for fiberoptic cable for projects defendant was completing for AT&T. The contract included a pay-when-paid provision, and a 48-hour notice requirement in the event of plaintiff's default before defendant could self-perform. Under the Agreement, plaintiff agreed to perform work on projects in Livonia and Rockwood which is the subject of this dispute.

On March 8, 2019, plaintiff submitted a $47,901.50 invoice to defendant for the Livonia project. This invoice noted $10,000 in payments already made by defendant, leaving a balance owed of $37,901.50. Defendant did not pay the balance. At some point in the spring of 2019, plaintiff stopped working on the Rockwood project because defendant made no further payment on the Livonia project invoice. On April 19, 2019, defendant e-mailed plaintiff regarding the

-1-

Rockwood project, stating: "We have been contacted by our customer on the completion of this project. We need the underground portion of this project completed immediately. We have gone past our completion date and we need to close it [sic] out this job." Plaintiff responded: "There are 2 problems[.] First problem: we need access to some properties[.] Second problem: we need to be paid[.]"

On April 26, 2019, defendant forwarded to plaintiff a complaint and a photograph of sidewalk damage involving the Livonia project sent by AT&T. Shep Surles, defendant's project manager for the Livonia and Rockwood projects, stated in the message to Ciprian Virlan, plaintiff's manager for the projects: "This sidewalk was damage[d] on the Livonia [project]. AT&T has called us out on this job. Could you give me a shout when you get a chance." Three days later, AT&T sent defendant a complaint from homeowners regarding property damage caused by work on the Rockwood project. Defendant forwarded this complaint to plaintiff, stating: "We need to address this issue immediately please."

On May 8, 2019, defendant notified plaintiff that AT&T requested completion on the Rockwood project, telling plaintiff: "You have 24 [hours] to be on this job or we will have to complete it." Plaintiff responded: "We need to be paid in order to complete any current project due to the fact you guys owe us money from the last Livonia project." Defendant concluded the exchange by stating: "We will start restoration in Livonia within 24 [hours]. We will start completion on Rockwood within 24 [hours]. Please read contract."

Less than two weeks later, defendant sent plaintiff e-mails detailing work required on both sites, stating they previously discussed pending restoration work requirements, and were now giving immediate deadlines. Defendant listed the following issues remaining at the Livonia project: "We have pedestals that are not properly placed. We have displaced landscaping. Your guys [crushed] the sidewalk with their machine. We have to replace concrete [where it was crushed]." For the Rockwood project, defendant sent a list of outstanding work, including: improper pedestal placement, landscaping issues, incorrect conduit, flower pot issues, and reel E and F were not completed. Defendant gave plaintiff 24 hours to complete both projects. On August 8, 2019, plaintiff submitted an invoice to defendant for the work performed on the Rockwood project. This invoice indicates a balance owed of $42,341, with no payments made by defendant.

On October 16, 2019, defendant sent e-mails to plaintiff stating plaintiff's refusal to repair and complete the work forced defendant to self-perform and defendant was charging plaintiff back charges to compensate. For the Livonia project, defendant listed these back charges as:

1) repair concrete sidewalk (email April 26, 2019)—$4,050.00

2) pedestals not properly placed—$930.00

3) damage to Comcast line—$4,500.00

4) restoration not done—$4,320.00

5) damaged dog fence—$400.00

6) conduit crushed causing redesign of project (had to place fiber aerial)

1,524' of conduit not placed properly—$10,668.00

7) trailer you refuse to return—$4,500.00

Subtracting these charges from the balance represented on plaintiff's original Livonia project invoice, defendant found the balance owed to plaintiff was $8,533.50. Defendant never paid plaintiff the balance it calculated, or any other amount for the Livonia project, after the initial payment of $10,000. For the Rockwood project, defendant listed the following causes for back charges: incorrect and clogged conduit installed; improper placement of conduit in other areas of the project; improper placement of and skipped pedestals; improper placement of and skipped ground field installation; damage to property requiring restoration and repair; and complete failure to install two of six reels of fiber. After the back charges, defendant calculated it owed plaintiff $13,661 for the work completed. Defendant never paid plaintiff the balance it calculated.

Plaintiff filed its complaint, alleging it fully completed its work on the Livonia and Rockwood projects, but defendant breached the Agreement by refusing to pay the invoices for this work. Plaintiff further alleged an account-stated claim, arguing defendant failed to object to plaintiff's invoices, establishing an account stated in the amount attested to by plaintiff.

Defendant counterclaimed, alleging breach of the Agreement. Defendant claimed plaintiff failed to fully and properly perform the work on the Livonia and Rockwood projects, causing it to incur expenses to complete and correct plaintiff's work. Defendant claimed these damages, a 10% markup specified under the Agreement, and attorney fees and costs under the Agreement.

## II. BENCH TRIAL

During a two-day bench trial, Samuel Herman, plaintiff's owner, testified the only complaints plaintiff received about the Livonia and Rockwood projects were the written communications from April 2019 to October 2019, stating at some points during his testimony he was unaware of the deficiencies until October 2019, and at other points admitting he was informed about certain issues in the spring of 2019. In regard to defendant's complaints in the Livonia project, Herman only agreed plaintiff was responsible for damage to the Comcast line. Regarding the Rockwood project, Herman could not state whether plaintiff had completed the fiber reels defendant alleged it completely failed to install. Herman also testified defendant repeatedly told him plaintiff's invoices were not being paid because defendant had not received payment from AT&T.

Virlan testified that any property damage caused by plaintiff was normal construction disturbance. Virlan also testified Surles was at the Livonia project daily during plaintiff's work, and made no complaints regarding the work while it was being performed. Regarding the Rockwood project, Virlan testified he received no complaints about pedestals or landscaping during the work, and plaintiff was instructed by defendant to install the conduit size it later claimed was incorrect. Virlan admitted plaintiff had not completed two reels, as defendant alleged, but claimed defendant told him it could not pay the Livonia project invoice when it was submitted because AT&T had not paid.

-3-

Anthony Lee is an owner of defendant, and serves as its operations manager. Lee stated plaintiff's invoices were not "appropriate bills" under the Agreement because they were not accurate regarding the work performed and plaintiff never completed either project. Lee testified defendant objected to the invoices by verbal and text complaints not in the record, which took place during the work and immediately after submittal of the invoices. Lee stated the Rockwood project invoice included charges for the reels Virlan admitted were not completed. Lee was asked about documentation showing AT&T paid defendant $224,666 for a partial invoice for the Livonia project on February 25, 2019. Lee admitted defendant received the payment, explaining statements made in the counterclaim that defendant had not been paid as of May 8, 2019, were made with the understanding defendant was not required to pay plaintiff until it was *fully* paid for the project, which did not occur until September 2019. Lee also stated that because AT&T paid defendant for the sidewalk repair, defendant was no longer seeking compensation from plaintiff for this work. Regarding the crushed conduit back charge for the Livonia project, Lee alleged the conduit was so damaged as to be unusable, forcing AT&T to redesign that portion of the project as an aerial line, which defendant installed before March 2019. Finally, Lee asserted defendant did not pay plaintiff the amount calculated in its October e-mails because plaintiff never responded to them or agreed to those amounts.

According to Surles, he informed Virlan of plaintiff's work problems through verbal conversation and text messaging while plaintiff was onsite performing the work. Surles asserted Virlan agreed there were issues with the work, but he refused to return to work before plaintiff was paid, forcing defendant to self-perform. This performance included the installation of the aerial line at the Livonia project, which AT&T was forced to redesign because the conduit installed by plaintiff was unusable. Surles discovered this damage when the fiber could not be passed through a portion of the installed conduit, and he opined that the conduit must have been improperly installed, causing damage when equipment passed over it, when the ground froze or thawed, or at a coupler connection. Although he could not remember in what month this damage was discovered, Surles informed plaintiff of it immediately. Regarding the Rockwood project, Surles denied instructing plaintiff to install conduit of a different size than what was called for in AT&T's plans and specifications. Although Surles stated some of the landscaping issues reported could not be addressed in the winter, other issues could be fixed as the work was being performed.

Joe Dade, the witness the trial court found most credible, is employed as a project manager by defendant, and held the position of lineman when he worked on the Livonia and Rockwood projects during defendant's self-performance. Dade agreed portions of the conduit installed by plaintiff at the Livonia project were unusable because of crushing or a coupler issue, causing a redesign to aerial installation. Dade also testified regarding the deficiencies in plaintiff's pedestal installation, improperly-sized conduit, site restoration and repair work. Dade agreed with Surles that defendant never requested or supplied the installation of conduit that was sized differently than what was specified by AT&T. Dade, confirming the testimony of Virlan and defendant's employees, stated plaintiff had not performed any work on two of the six reels specified for the Rockwood project, and defendant was forced to incur costs installing these reels itself.

In closing, plaintiff argued defendant committed the first material breach by not paying plaintiff's March 8, 2019 invoice because no documented complaints regarding the work were made until after the seven-day deadline for payment. Plaintiff argued defendant's breach of failing to pay excused it from performing further. Regarding a trailer provided by defendant, plaintiff

-4-

conceded: "[W]e agree, my client still has that, and . . . it should go back." Plaintiff also argued the amount stated on its invoices was accepted by defendant because it had not properly objected to the invoices.

Defendant contended plaintiff first materially breached the Agreement by improperly performing and failing to complete the work, and refusing to cure defective work. Because plaintiff had not completed the scope of work, the warranty provision was irrelevant to the dispute. Defendant also contended plaintiff failed to satisfy the conditions precedent to payment, including: (1) the submittal of an appropriate invoice—one which accurately reflects the work performed and the credits owed to defendant for defective work, (2) the submittal of a sworn statement, and (3) the submittal of subcontractor lien waivers. Defendant contended it properly objected to the invoices.

The trial court found that although Herman's and Virlan's testimony was "at times . . . credible, [their] professions regarding the completion of the work at issue and not knowing KML's complaints for months were completely incredible and ungrounded. With regard to the key issues in this case, [their] testimony is given nearly no weight." Conversely, the trial court found the testimony of Lee, Surles, and Dade to be credible and "afforded [it] great weight." The trial court also found by clear and convincing evidence that "KML waived the requirement that sworn statements from Milenium, and its vendors be received prior to payment."

Regarding plaintiff's performance under Section 9 of the Agreement, the trial court found:

> Milenium failed to perform the Work on the Projects to the specifications required under the Agreement. Incorrect conduits were installed (the gauge was wrong); reels were improperly installed; pedestals were defective; the grounds were damaged by an underground crew; a dog fence was destroyed; piping was unusable; and landscaping was not restored. The premises were not anything close to approaching broom clean. KML personnel repeatedly informed Milenium orally and by text that Milenium had not performed the Work correctly before Milenium invoiced for any of the Work at issue. Although Virlan admitted many of these issues existed, and said that they would be rectified, they never were. Milenium refused to complete the Work. Instead, Milenium sent KML an invoice for the Livonia Project, which it expected to be fully compensated by the Ides of March (March 15), 2019. The same occurred in connection with another invoice which KML expected to be paid by August 15, 2019. The parties continued to squabble over the dispute for months; Milenium never completed to [sic] the Work and KML did not pay the invoices in full.

The trial court concluded that "Milenium breached the Agreement by not performing the Work as required under Section 9. . . . As such, KML had no duty to pay the invoices, no account was stated, and Milenium engaged in the first substantial breach of the Agreement." The trial court dismissed plaintiff's claims and defendant's counterclaim. Because the parties agreed, the trial court ordered plaintiff to return defendant's trailer. This appeal followed.

III. STANDARD OF REVIEW

In a bench trial, the trial court's findings of fact are reviewed for clear error and conclusions of law are reviewed de novo. *Heeringa v Petroelje*, 279 Mich App 444, 448; 760 NW2d 538 (2008). "Clear error exists only when the appellate court is left with the definite and firm conviction that a mistake has been made." *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 471; 719 NW2d 19 (2006) (quotation marks and citation omitted).

## IV. WITNESS CREDIBILITY

The trial court did not commit clear error in determining the testimony of defendant's operations manager and former project manager was more credible than that of plaintiff's witnesses, because there were no material contradictions in their testimony.

In actions tried without a jury, the trial court must find the facts, and state separately its conclusions of law. MCR 2.517(A)(1); MCR 6.403; *Douglas v Allstate Ins Co*, 492 Mich 241, 256; 821 NW2d 472 (2012). The findings and conclusions concerning contested matters are sufficient if brief, definite, and pertinent, without over-elaboration of detail or particularization of facts. MCR 2.517(A)(2); *Kemerko Clawson, LLC v RxIV Inc*, 269 Mich App 347, 355; 711 NW2d 801 (2005). Findings are sufficient if it appears the trial court was aware of the issues in the case and correctly applied the law. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176; 530 NW2d 772 (1995).

At a bench trial, the trial court is "obligated to determine the weight and credibility of the evidence presented." *Wright v Wright*, 279 Mich App 291, 299; 761 NW2d 443 (2008). We must "defer to the trial court's credibility determinations given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011). However,

> [t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. [*Beason v Beason*, 435 Mich 791, 804; 460 NW2d 207 (1990) (quotation marks and citations omitted).]

Plaintiff argues the trial court erred in its favorable credibility determinations of Lee and Surles. The trial court found, "regarding the credibility, demeanor, veracity, vocal tone and expression, tonality, and honesty" of Lee and Surles:

- Anthony Lee . . . Although a bit of his testimony was originally mistaken, the sum and final testimony he provided was very credible, straightforward, and authentic, and his testimony is afforded great weight.

- Shep Surles . . . His testimony was straightforward, credible, and authentic, and his testimony is afforded great weight.

The key contentions Lee and Surles make, which lack documentary evidence and therefore rely on witness credibility alone, are contentions regarding the deficiencies in plaintiff's work and inaccuracies in its billing, and defendant's verbal and text messaging complaints regarding these deficiencies made before the e-mail communications admitted in the record. These contentions are crucial to the determination of the first material breach issues examined below.

First, addressing Lee's credibility, plaintiff contends Lee's representations about whether defendant was paid by AT&T before and during trial were so far impeached, as to thoroughly discredit the whole of Lee's testimony. During his testimony, Lee maintained the veracity of defendant's counterclaim statement it had not received payment from AT&T for the Livonia project as of May 8, 2019. However, when confronted with evidence defendant was paid $224,666 for a partial invoice on the project in February 2019, Lee readily agreed defendant was paid the amount, and clarified:

> Well, we never . . . disputed any of that. What this was, on paragraph 19 [of the counterclaim], . . . to my understanding when I signed it, I was under the impression that because we hadn't been paid in full for this job, and because of the discrepancies that we found in their work as of May 8th, it wasn't a complete bill, it wasn't an accurate bill . . . .

Plaintiff suggests, because of the arguably inconsistent statements made by Lee on this point, the trial court's determination of Lee's credibility should not be given the standard deference afforded to the finder of fact in consideration of its "superior position to make [credibility] judgments." *Shann*, 293 Mich App at 305. However, Lee's testimony on this point does not meet the standard for an exception to judicial deference on the subject of credibility, because "objective evidence [does not] contradict the witness' story," and "the story itself [is not] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Beason*, 435 Mich at 804. Lee explained he was making statements about not being paid by AT&T on the basis of his understanding the pay-when-paid provision of the Agreement required defendant to pay only after it received full payment for the project from AT&T. Whether his interpretation of the Agreement is correct, it explains Lee's statements, because defendant did not receive final payment for the project until September 2019. There is no contradiction, inconsistency, or implausibility mandating a reasonable fact-finder to discredit Lee as a witness, *Beason*, 435 Mich at 804, only an explanation of a potential contradiction, the assessment of which is within the realm of the finder of fact.

Plaintiff also argues Lee was untruthful in attempting to charge plaintiff for sidewalk repair, when AT&T paid for this work in September 2019. However, during his testimony Lee stated defendant was no longer seeking compensation from plaintiff for this work. Lastly, plaintiff argues defendant's spending of the money paid by AT&T without reserving payment for plaintiff's work is a demonstration of the general dishonesty of Lee. However, "clear error exists only when the appellate court is left with the definite and firm conviction that a mistake has been made," *Herald Co*, 475 Mich at 471 (quotation marks and citation omitted), and the trial court's determination after weighing its first-hand impressions of the witness against any indication of his general dishonesty, is not clearly mistaken.

-7-

Turning to Surles's credibility, plaintiff maintains Surles's testimony regarding the alleged crushed conduit at the Livonia project was so inconsistent as to render Surles's testimony incredible. Surles stated the conduit was crushed after installation because of plaintiff's defective work. Regarding the cause of the alleged crushing, Surles testified:

> *Q*. Without digging it up, my point is, without digging it up, is there any way to tell if the damage, the crushed conduit was caused by improper installation or by some change in the weather, the ground shifting, thawing, all that?
>
> *A*. Well, it's their responsibility for that pipe to work when you install it.

Later, Surles testified:

> And when we measured it and we—we rechecked it and rechecked it and then rechecked it, finding out where our problem was, we isolated it to a—an area where there was a 90, and also it could—it could have been a coupler. It might not have been just a crushed conduit, okay? Crush is not the definitive problem here.

Surles's testimony regarding the discovery of the defective installed conduit was confused and imprecise:

> *Q*. And when did you learn about this crushed conduit?
>
> *A*. Upon installing the fiber.
>
> \* \* \*
>
> *Q*. When was that?
>
> *A*. That was in the winter, wasn't it? I can't give you an exact date. It was closer to October, when I was sending them emails.
>
> \* \* \*
>
> *Q*. You just said October, but this is the Livonia project, they were working on that—you said they started, like in November, and then they continued to January, is that right? They started before the ground froze and they continued until January?
>
> *A*. Yeah, they started the project before then. The timing on it is—our issue was we were behind on the deadline of the project, okay, and our customer was telling us this needs to be completed because we went past our deadline. Those dates, I would have to—I have to go back and research and say, okay, they started on Tuesday at this time.

Surles also testified he notified plaintiff of the issue immediately after discovering it, which he clarified was before May 21, 2019. Later, he contradicted himself and testified the crushed conduit issue was discovered after May 21, 2019.

-8-

Neither discrepancy in Surles's testimony meet the standard necessary to demonstrate clear error—testimony "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Beason*, 435 Mich at 804. Surles's apparent equivocation regarding the cause of the defect in the conduit can be explained by the possibility that the term "crushed conduit" was likely being used by him as a proxy for all problems caused by incorrect installation of conduit, which result in an inability to install the fiber. This makes sense, since determining the precise cause of such an issue by excavating at its location would often be cost ineffective. Considering Surles's statement, that even if a crush is caused by seasonal freezing and thawing, "it's [the boring subcontractor's] responsibility for that pipe to work when you install it," it is reasonable to interpret Surles's admission that the problem could have been a coupler as made with the same understanding. Thus, a reasonable fact-finder's interpretation of the Surles's testimony could find a lack of contradictions in these statements.

There is, however, clear contradiction in Surles's statements about when the conduit problem was discovered, and when plaintiff was notified. After making statements about not knowing when the discovery was made, but suggesting first that it was in the winter and then, that it was in October, Surles stated it was discovered before May 21, 2019, and promptly contradicted himself by stating it was after May 21, 2019. However, a reasonable fact-finder could find Surles's professed uncertainty regarding the timeline of this event, which took place three years before trial, did not render his testimony "so internally inconsistent or implausible on its face" to discredit it. *Beason*, 435 Mich at 804. The trial court found Surles's testimony to be "straightforward, credible, and authentic." "[G]iven its superior position to make these judgments," *Shann*, 293 Mich App at 305, the trial court was within its proper role as fact-finder in determining Surles's credibility was not materially damaged by obvious confusion regarding the date of a particular event.

## V. NONPERFORMANCE

The trial court did not err in finding plaintiff committed the first material breach of the Agreement by failing to properly install the conduit at the Livonia project, depriving defendant of a substantial benefit of the Agreement.

As a preliminary matter, courts give contractual language its plain and ordinary meaning unless otherwise defined. *English v Blue Cross Blue Shield of Michigan,* 263 Mich App 449, 471; 688 NW2d 523 (2004). "Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract. Thus, the fact-finder must interpret the contract's terms. . . ." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003) (quotation marks and citations omitted).

Turning specifically to breach of contract, to prove such a claim a party must establish: "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 100; 878 NW2d 816 (2016). "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (quotation marks and citations omitted). However, this rule of first breach only applies when the initial breach is substantial. *Id*.

-9-

A breach is substantial if it "effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration . . . or the prevention of further performance by the other party . . . ." *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 574; 127 NW2d 340 (1964). This Court has also looked to factors used to define a "material" breach in determining if a first breach is substantial. See *Able Demolition v City of Pontiac*, 275 Mich App 577, 585; 739 NW2d 696 (2007). "In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably expected to receive." *Omnicom of Michigan v Giannetti Investment Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997). Further:

> Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the willfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract. [*Id*.]

Also, parties to a written contract may waive provisions in their contract. *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 364-365; 666 NW2d 251 (2003). "[A] valid waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose, or be an implied waiver, evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Patel v Patel*, 324 Mich App 631, 634; 922 NW2d 647 (2018) (quotation marks and citations omitted).

When a material breach of a contract occurs without an indication by the breaching party, it intends to repudiate the remainder of the contract. The injured party must choose to either continue performance, or cease performance and seek damages. *Schnepf v Thomas L McNamara Inc*, 354 Mich 393, 397; 93 NW2d 230 (1958). Our Supreme Court has stated, in response to a breach that qualifies as material,

> [a]ny act indicating an intent to continue will operate as a conclusive election, not indeed of depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part. Anything which draws on the other party to execute the agreement after the default . . . or which shows that it is deemed a subsisting agreement after such default will amount to a waiver. [*Id*. (citations omitted; italics in original).]

If an injured party has waived a material breach, it may be held liable for its own subsequent breach. *Id*. at 397-398.

The Agreement at issue states of the work to be performed:

> Subcontractor shall furnish and perform all applicable work, as directed in writing by Contractor and agreed to by Subcontractor in a good and workmanlike manner and in strict accordance with this Agreement, any prime contract between Contractor and its customer (project owners, Telecommunications Companies,

-10-

etc.), . . . and all appropriate plans and specifications pertaining to the applicable work.

* * *

Subcontractor shall be responsible for the proper clean-up of all debris, dust, materials, etc. pertaining to its Work. Subcontractor should leave its work area broom clean.

The Agreement also states: "No request for payment by any Subcontractor will be approved by Contractor unless all terms and conditions of this Agreement are fulfilled."

Defendant presented documentary evidence to support its claim that plaintiff breached Section 9 of the Agreement by failing to complete the work and refusing to return to both project sites to complete it when requested to do so by defendant. However, this evidence only supports the contention that plaintiff breached on April 19, 2019, or later, and does not substantiate the claim that plaintiff breached before March 8, 2019, when it submitted its invoice for the Livonia project.

Defendant also presented testimony asserting plaintiff failed to "perform all applicable work," thereby breaching Section 9 of the Agreement. Importantly, testimony presented by defendant and found credible by the trial court showed defendant made verbal and text message complaints regarding these deficiencies before the e-mail communications admitted in the record, including during the work at the Livonia project, which was before plaintiff's submittal of the Livonia project invoice. Though communications regarding the deficiencies is undocumented before April 19, 2019, the testimony of Lee and Surles is that it took place while the work was being performed in January 2019. In particular, Lee's statement about the aerial redesign and installation clarifies the timing of defendant's complaints associated with the "crushed conduit":

> *Q*. Do you think that if you had paid Milenium, they would have done the warranty work?
>
> *A*. No, I do not, and here's why. We got paid on the 22nd of February. They say they were finished in January, early January. In order for us to have gotten paid, we had to have gotten that aerial put up before they—so that AT&T could turn that area on to be usable. Well, in order for that to happen, we had already had to have already talked to them about coming to fix the stuff that we needed them to fix in order for us to not have to go aerial.

While plaintiff's witnesses denied they were aware of any deficiencies in their work until after the payment of their invoice would have been due, March 15, 2019, the trial court found this testimony incredible and gave great weight to defendant's witnesses. Plaintiff does not argue against the trial court's unfavorable determination regarding its own witnesses, only the favorable determination regarding Lee's and Surles's testimonies, which we have determined was not clearly erroneous. On the basis of these determinations, the trial court found:

> Milenium failed to perform the Work on the Projects to the specifications required under the Agreement. Incorrect conduits were installed (the gauge was

-11-

wrong); reels were improperly installed; pedestals were defective; the grounds were damaged by an underground crew; a dog fence was destroyed; piping was unusable; and landscaping was not restored. The premises were not anything close to approaching broom clean. KML personnel repeatedly informed Milenium orally and by text that Milenium had not performed the Work correctly before Milenium invoiced for any of the Work at issue. . . . Milenium refused to complete the Work.

Of these deficiencies, plaintiff concedes only the issue of the "piping [being] unusable"— what was described in testimony as the "crushed conduit" issue at the Livonia project—had any potential of qualifying as a material breach, but maintains plaintiff was not informed of it until after March 15, 2019. Considering Lee's testimony about this deficiency, which the trial court found "very credible," the trial court's finding that defendant "informed [plaintiff] orally and by text that [plaintiff] had not performed the Work correctly before [plaintiff] invoiced for any of the Work at issue," was reasonable. Given its stated credibility determinations and the evidence, we find no basis for a "definite and firm conviction that a mistake has been made," *Herald Co*, 475 Mich at 471 (quotation marks and citation omitted), in this finding.

Turning to the trial court's application of the law of the first material breach, and considering the unusable installed conduit issue at the Livonia project specifically, this deficiency and a refusal to return to the site to remedy it, resulted in a circumstance where defendant could not "obtain[] the benefit it reasonably expected to receive" under the Agreement. *Omnicom of Michigan*, 221 Mich App at 348. The purpose of the Agreement was the installation of underground conduit for placement of telecommunications fiber, and the defective conduit installation made it impossible to get the fiber through, depriving defendant of the benefit of the Agreement.

Considering the other factors stated in *Omnicom of Michigan*, though defendant could be financially compensated for plaintiff's lack of performance and the parties agree plaintiff partially performed at the Livonia project, the other factors weigh in favor of a determination that the breach was material. *Omnicom of Michigan*, 221 Mich App at 348. Plaintiff's "hardship . . . in terminating the contract," *id*., the loss of the value of the work performed at the Livonia project minus the $10,000 payment made—a value which the parties agree is between $37,901.50 and $8,533.50—is not obviously in excess of defendant's hardship of a redesign of work originally valued at $10,668 and self-performing under a time crunch imposed by a displeased customer, AT&T. "[T]he willfulness of the breaching party's conduct," *id*., is apparent in plaintiff's refusal to return to the Livonia project to fix deficiencies and demand for payment-in-full despite not completing the scope of work, in contradiction of Section 7 of the Agreement. Plaintiff also refused to continue work it was assigned and began at the Rockwood project, indicating it was not intending to "perform the remainder of the contract". *Id*. Balancing these considerations, the trial court's determination that plaintiff materially breached the Agreement before submitting its March 8, 2019 invoice was not in error.[1]

---

[1] In its brief on appeal, defendant argued for an award of attorney fees in response to plaintiff's argument that it did not commit the first material breach. An argument for attorney fees under the

The evidence also showed that defendant continued to ask plaintiff to return to the Livonia project to complete the work after this breach, and continued to request that plaintiff perform other work—on the Rockwood project and potentially on other projects. While "[a]ny act [by the injured party] indicating an intent to continue" a contract after a material breach deprives it "of any excuse for ceasing performance on [its] part," *Schnepf*, 354 Mich at 397, this is only significant if defendant did breach the Agreement by refusing to pay plaintiff's invoice, as plaintiff alleges. We turn to this question below.

## VI. FAILURE TO PAY

Defendant did not commit a breach when it failed to pay plaintiff's invoice for the Livonia project because the invoice did not appropriately reflect deficiencies plaintiff was made aware of, and plaintiff had not completed the scope of work.

Again, the Agreement states:

> Subcontractor shall furnish and perform all applicable work, as directed in writing by Contractor and agreed to by Subcontractor in a good and workmanlike manner and in strict accordance with this Agreement, any prime contract between Contractor and its customer (project owners, Telecommunications Companies, etc.), . . . and all appropriate plans and specifications pertaining to the applicable work.

> \* \* \*

> Subcontractor shall be responsible for the proper clean-up of all debris, dust, materials, etc. pertaining to its Work. Subcontractor should leave its work area broom clean.

The Agreement also provides that "No request for payment by any Subcontractor will be approved by Contractor unless all terms and conditions of this Agreement are fulfilled." The terms of payment include:

> Prior to any payment by Contractor to Subcontractor, Subcontractor must submit its applicable bill / invoice to Contractor, as well as a sworn statement from Subcontractor and lien waivers from Subcontractor's vendors pertaining to the Subcontractor's Work. Contractor will pay Subcontractor for its Work within seven (7) days of Contractors' [sic] receipt of: (a) an appropriate bill / invoice from Subcontractor; (b) appropriate sworn statement from Subcontractor; (c) appropriate

---

Agreement does not fall within the issues raised on appeal. Without filing a cross-appeal, an appellee is limited to contesting the issues raised by the appellant. *Cheron, Inc v Don Jones, Inc*, 244 Mich App 212, 221; 625 NW2d 93 (2000). Additionally, a request for appellate attorney fees as a disciplinary action "must be contained in a motion filed under [MCR 7.211(C)(8)]." MCR 7.211(C)(8). Therefore, neither argument for attorney fees is properly before this Court.

-13-

lien waivers from the Subcontractor's vendors; and (d) payment from the applicable project Owner(s) for Subcontractor's Work.

Though the trial court found defendant "waived the requirement that sworn statements from [plaintiff], and its vendors be received prior to payment," the condition precedent to payment of receipt of an "appropriate invoice" was never satisfied for either project. The phrase "an appropriate bill / invoice from Subcontractor" is not defined in the Agreement and has no obvious plain meaning, and is left to "a factual determination as to the intent of the parties in entering the contract." *Klapp*, 468 Mich at 469 (quotation marks and citations omitted). The March 8, 2019 invoice for the Livonia project did not account for multiple uncompleted or improperly completed work items, which, by the trial court's findings of fact, were reported to plaintiff before it submitted its invoice. The August 8, 2019 invoice for the Rockwood project included charges for the completion of Reels E and F, portions of the project plaintiff admits it did not complete. In its contract interpretation, the trial court found these to be "inappropriate bills" because they included project work that was not completed, and the suggestion that an "incorrect bill" necessarily falls within the definition of an "inappropriate bill" is not clearly erroneous. *Herald Co*, 475 Mich at 471.

Further, defendant was not obligated to pay any invoice "unless all terms and conditions of [the] Agreement [were] fulfilled." These terms include Section 9, which required plaintiff to "perform all applicable work, as directed in writing by [defendant] . . . in a good and workmanlike manner and in strict accordance with . . . all appropriate plans and specifications pertaining to the applicable work."

Defendant presented documentary evidence to support its contention that plaintiff failed to complete the work and refused to return to either project to complete it when requested to do so by defendant. Defendant also presented testimony asserting plaintiff failed to "perform all applicable work," in breach of Section 9 of the Agreement, and defendant made complaints regarding these deficiencies before plaintiff's submittal of the March 8, 2019 invoice. The trial court found this testimony highly credible and straightforward, and made findings of fact that plaintiff "failed to perform the Work on the Projects to the specifications required under the Agreement." These findings were not clearly erroneous. Because, under the Agreement, defendant was not obligated to pay plaintiff before its work was completed, plaintiff did not commit a breach when it did not pay the March 8, 2019 or August 8, 2019 invoice.

## VII. ACCOUNT STATED

Because defendant objected to the charges in the March 8, 2019 and August 8, 2019 invoices, no mutual assent to an account stated was established.

"An account stated is a contract based on assent to an agreed balance, and it is an evidentiary admission by the parties of the facts asserted in the computation and of the promise by the debtor to pay the amount due." *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 557; 837 NW2d 244 (2013) (quotation marks and citations omitted). "An account stated, like all contracts, requires mutual assent. Specifically, an account stated requires the manifestation of assent by both parties to the correctness of the statement of account between them." *Id*.

-14-

"When an account is stated in writing by the creditor and accepted as correct by the debtor, either by payments thereon without demur or by failure within a reasonable time to question the state of the account as presented, it becomes an account stated." *Larsen v Stiller*, 344 Mich 279, 288; 73 NW2d 865 (1955) (quotation marks and citation omitted). A party's acceptance may be inferred when the party makes payments on the amount due or receives an accounting and fails to object within a reasonable time. *Corey v Jaroch*, 229 Mich 313, 315; 200 NW 957 (1924); *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 331; 657 NW2d 759 (2002). "[W]hen silence forms the basis for inferring assent to a sum owed, the circumstances involved must support an inference of assent." *Dunn v Bennett*, 303 Mich App 767, 773; 846 NW2d 75 (2014).

Defendant presented documentary evidence showing plaintiff was notified of its failure to complete the work represented in its invoices regarding the Livonia and Rockwood projects. Defendant also presented testimony showing defendant made complaints regarding these deficiencies before plaintiff's submittal of the March 8, 2019 invoice. The trial court found this testimony highly credible and straightforward, and made a finding of fact that defendant "repeatedly informed [plaintiff] orally and by text that [plaintiff] had not performed the Work correctly before [plaintiff] invoiced for any of the Work at issue." These findings were not clearly erroneous. As such, defendant never manifested assent "to the correctness of the statement of account between [the parties]." *Fisher Sand & Gravel*, 494 Mich at 557.

Acceptance of the account stated cannot be inferred, not only because of the objections made by defendant, but because the only payment made by defendant was before the first invoice, by which plaintiff is claiming an account stated was even produced. This payment cannot illustrate acceptance, *Corey*, 229 Mich at 315, because plaintiff had not stated the account when it was made.

Affirmed.


/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel

-15-